**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-3742
_____

NORTHEAST REVENUE SERVICES, LLC,
                                        Appellant

v.

MAPS INDEED, INC; VICTOR DEANTHONY, JAMES FILLA,
JEFFERY DEANTHONY, INSEQUENCE, INC.
_____

On Appeal from the United States District Court for the
Middle District of Pennsylvania
(D.C. No. 3-14-cv-00852)
District Judge:  Hon. Edwin M. Kosik
_____

Submitted under Third Circuit L.A.R. 34.1(a)
April 7, 2017

Before:  CHAGARES, SCIRICA, and FISHER Circuit Judges.

(Filed: April 12, 2017)
_____

OPINION*
_____

* This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

CHAGARES, Circuit Judge.

The plaintiff, Northeast Revenue Services LLC ("Northeast Revenue"), brought this suit alleging violation of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78a et seq. (the "Securities Exchange Act"); the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, et seq. ("RICO"); and various state laws. The District Court granted the defendants' motions to dismiss. For the reasons set forth below, we will affirm the order of the District Court.[1]

I.

Because we write exclusively for the parties, we set forth only those facts necessary to our disposition. The facts, as alleged in the Amended Complaint, are as follows. Northeast Revenue is a Pennsylvania limited liability company. Maps Indeed, Inc. ("Maps Indeed") is a registered Virginia corporation. Victor DeAnthony was the president and CEO of Maps Indeed and was "an employee, agent, representative, or principal" of Insequence, Inc. ("Insequence"). Appendix ("App.") 38 ¶ 6. Jeffrey DeAnthony was the chief marketing officer of Maps Indeed and was also "an employee, agent, representative, or principal" of Insequence. App. 38 ¶ 7.[2] Insequence is a Missouri corporation with the same registered office address as Maps Indeed. Insequence "was/is the parent company, controlling shareholder in, and alter ego of

---

[1] The District Court granted James Filla's motion to dismiss on April 30, 2015, and that order is not at issue in this appeal.

[2] James Filla is/was the chief technology officer and a director and principal at Maps Indeed. He is also the president and CEO of Insequence. Filla and the DeAnthonys are referred to collectively in the Amended Complaint as the "Individual Defendants."

Defendant Maps Indeed, Inc." App. 38 ¶ 8. Northeast Revenue argues that whereas Maps Indeed was purported "to be a technology company using global satellite imagery to provide a service allowing its clients to access and share geospatial and property data (e.g., property assessment values and municipal tax liabilities) in real time and online," App. 43 ¶ 23, in reality, it was a "phony subsidiary and/or affiliate company," App. 39 ¶ 13, of Insequence that was "used partially as a corporate shell to collect money from unsuspecting investors." App. 43 ¶ 24.

In 2012, the Individual Defendants approached Northeast Revenue about entering into a contract. The terms of the contract were negotiated in Pennsylvania, and the contract was executed there as well. According to Northeast Revenue, the Individual Defendants made several misrepresentations to it, thereby fraudulently inducing Northeast Revenue to enter into the contract. Northeast Revenue alleges that the defendants "manufactured and furnished Plaintiff with purportedly accurate financial statements and financial projections ('pro formas') that were designed to induce Plaintiff to enter into the agreement, and to pay Defendants specified sums of money pursuant to same." App. 46 ¶ 36. Northeast Revenue also alleges that the DeAnthonys "personally extended oral warranties to Plaintiff regarding the viability of the products, services, and investment opportunity contemplated under the agreement." App. 46 ¶ 40, 41. Northeast Revenue entered into an agreement with Maps Indeed, executed by Victor DeAnthony on its behalf in his capacity as president. Under the terms of the contract, Northeast Revenue was required to pay a total of $150,000.00 to Maps Indeed and to "market Maps Indeed, Inc.['s] proprietary software to Counties and Municipalities in the

3

Commonwealth of Pennsylvania" and to "assist Maps Indeed, Inc. with the setup and maintenance of its geospatial information system." App. 114. In exchange, Maps Indeed would provide "products, services, and investment return." App. 47 ¶ 45. Northeast completed its payments and "Defendants failed to perform at all and provided none of the agreed upon products, support, and/or services to Plaintiff." App. 47 ¶ 47.

Northeast Revenue alleges that it was not the defendants' only victim. It alleges that at least three other Pennsylvania citizens were also induced into entering contracts with the defendants. Northeast Revenue alleges that among the misrepresentations conveyed to the other victims were the following:

> (a) untrue statements about former Pennsylvania Governor Thomas Ridge's involvement as a director of Defendant Maps Indeed, Inc., (b) founding shareholder of America Online, Inc. ("AOL") also serving as a director of Maps Indeed, Inc., (c) the imminent acquisition of Defendant Maps Indeed, Inc. by LexisNexis Group, Inc. or Xerox Corporation Ltd., and (d) Individual Defendants' issuance of several artificial and altered statements of financial projection(s).

App. 41 ¶ 18. The defendants also represented that Maps Indeed's "core technology was originally developed for the Department of Defense . . . [and] [t]he success within [t]he Department of Defense prompted the continued development to allow full technology integration within all levels of government." App. 44 ¶ 28 (quoting App. 104). In total, the other victims lost at least $380,000.00 in investments in Maps Indeed.

Insequence filed a motion to dismiss the complaint for lack of personal jurisdiction and for failure to state a claim. Maps Indeed and Victor DeAnthony filed a motion to dismiss for failure to state a claim and for a more definite statement. Jeffrey DeAnthony filed a motion to dismiss for failure to state a claim. The District Court concluded that

4

although there was personal jurisdiction over Insequence, Northeast Revenue failed to state a claim under federal law against any of the defendants and declined to exercise supplemental jurisdiction over the state law claims. The District Court did not grant Northeast Revenue leave to amend its complaint. Northeast Revenue timely appealed.

## II.[3]

On appeal, Northeast Revenue argues that the District Court erred by concluding that it had not adequately alleged securities fraud, a RICO violation, and a RICO conspiracy. It also argues that the District Court abused its discretion by failing to provide an opportunity <u>sua</u> <u>sponte</u> to amend the complaint.[4]

## A.

Count One alleges securities fraud under Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5. Section 10 of the Securities Exchange Act includes an implied cause of action. See <u>Amgen Inc. v. Connecticut Ret. Plans & Trust Funds</u>, 133 S. Ct. 1184, 1207 (2013). "The elements of an implied § 10(b) cause of action for securities fraud are '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3)

---

[3] The District Court had jurisdiction over federal law claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367. We have jurisdiction pursuant to 28 U.S.C. § 1291.

[4] We exercise plenary review over an order granting a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). <u>Simon v. FIA Card Servs., N.A.</u>, 732 F.3d 259, 264 (3d Cir. 2013). "Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court concludes that those allegations 'could not raise a claim of entitlement to relief.'" <u>Id.</u> (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 558 (2007)). "We review a district court decision refusing leave to amend under Federal Rule of Civil Procedure 15(a) for abuse of discretion." <u>Great W. Mining & Mineral Co. v. Fox Rothschild LLP</u>, 615 F.3d 159, 163 (3d Cir. 2010).

a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" Id. (quoting Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 37–38 (2011)). The District Court concluded that Northeast Revenue failed to state a claim for violation of the Securities Exchange Act because Northeast Revenue did not purchase a "security," as defined by the statute.

The statutory definition of "security" includes "several catch-all categories which were designed to cover other securities interests not specifically enumerated in the statute." Steinhardt Grp. Inc. v. Citicorp, 126 F.3d 144, 150 (3d Cir. 1997) (interpreting 15 U.S.C. § 77b(a)(1) with a substantially similar definition of "security"). Northeast Revenue argues that its contract falls into one of these categories as an "investment contract." An investment contract is "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . ." S.E.C. v. W.J. Howey Co., 328 U.S. 293, 298–99 (1946). "Thus, the three requirements for establishing an investment contract are: (1) 'an investment of money,' (2) 'in a common enterprise,' (3) 'with profits to come solely from the efforts of others.'" Steinhardt, 126 F.3d at 151 (quoting Howey, 328 U.S. at 301). The parties do not dispute that the first two elements of the Howey test are satisfied but contest whether the third element is satisfied. The question we must answer is whether Northeast Revenue's profits were to come solely from the effort of others.

The third element of the Howey test "requires that the purchaser be attracted to the investment by the prospect of a profit on the investment rather than a desire to use or

consume the item purchased." Steinhardt, 126 F.3d at 152. Courts look at "whether the investor has meaningfully participated in the management of the partnership in which it has invested such that it has more than minimal control over the investment's performance." Id. We consider "the transaction as a whole, considering the arrangements the parties made for the operation of the investment vehicle in order to determine who exercised control in generating profits for the vehicle." Id. at 153 (footnote omitted). Importantly, the definition of an investment contract "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." S.E.C. v. Edwards, 540 U.S. 389, 393 (2004) (quoting Howey, 328 U.S. at 299). Accordingly, we have held that "an investment contract can exist where the investor is required to perform some duties, as long as they are nominal or limited and would have 'little direct effect upon receipt by the participant of the benefits promised by the promoters.'" Lino v. City Investing Co., 487 F.2d 689, 692 (3d Cir. 1973) (quoting Sec. & Exch. Comm'n Release Notice, Release No. 5211 (Nov. 30, 1971)). In Lino, for example, we concluded that the franchise license agreements at issue were not investment contracts because they required the licensee to make "significant efforts"; he was required to "open a sales center, staff it, and devote full time and best efforts to his business," as well as "recruit [and train] area distributors." Id. at 693.

The District Court here concluded that "[Northeast Revenue] was required to make 'significant efforts' under the Agreement, as the benefits promised by the Agreement, were based directly on [Northeast Revenue's] duties." App. 14. In

7

particular, Northeast revenue was required to "market [Maps Indeed's] proprietary software to Counties and Municipalities in the Commonwealth of Pennsylvania" and "assist [Maps Indeed] with the setup and maintenance of its geospatial information system." App. 14–15. Northeast Revenue argues that the "'essential managerial efforts which affect the failure or success of the enterprise' all fall squarely on Maps Indeed." Northeast Revenue Br. 17 (quoting Lino, 487 F.2d at 692). In particular, Maps Indeed was responsible for "providing, hosting and maintaining the geospatial information system." Id.

Although Northeast Revenue accurately states Maps Indeed's obligations under the contract, it minimizes its own obligations. The beginning of the contract is particularly illustrative in demonstrating the cooperative relationship between Northeast Revenue and Maps Indeed. It provides, in pertinent part,

> WHEREAS, Maps Indeed, Inc. is a technology company which provides services to County and State Governments to share and sell data online;
> WHEREAS, Northeast Revenue Services, LLC provides services to County and Municipal Governments;
> WHEREAS, Maps Indeed, Inc. has developed a geospatial information system which provides online access to geo-reference and non-geo-reference information in an online interface;
> WHEREAS, Northeast Revenue Service, LLC has developed unique expertise and experience with marketing its products to Counties within the Commonwealth of Pennsylvania;
> WHEREAS, Maps Indeed, Inc. desires assistance with marketing its geospatial information system to customers of the Commonwealth of Pennsylvania from Northeast Revenue, LLC;
> WHEREAS, the parties have reached an agreement whereby Northeast Revenue Service, LLC shall be granted exclusive licensing for Maps Indeed, Inc. within the Commonwealth of Pennsylvania . . . .

App. 113. The contract then describes the aforementioned obligations of each party.

8

This is not a contract in which the plaintiff's duties are "nominal or limited and would have 'little direct effect upon receipt by the participant of the benefits promised by the promoters.'" Lino, 487 F.2d at 692 (quoting Sec. & Exch. Comm'n Release Notice, Release No. 5211 (Nov. 30, 1971)). Rather, the success of Maps Indeed and the profits to be derived by Northeast Revenue are, in part, dependent on Northeast Revenue's networking, expertise and marketing efforts, as well as its efforts to "setup and maint[ain]" the Maps Indeed system in the Commonwealth of Pennsylvania. App. 114. Therefore, we conclude that the contract between Northeast Revenue and the defendants is not an investment contract and that Northeast Revenue failed to state a claim for securities fraud.

B.

Count Two alleges violation of RICO, and Count Three alleges conspiracy to violate RICO. "To plead a RICO claim under § 1962(c), 'the plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 362 (3d Cir. 2010) (quoting Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir. 2004), abrogated in part on other grounds by Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007)). To plead a pattern of racketeering activity, a plaintiff must allege "at least two acts of racketeering activity within a ten-year period." Id. at 363 (citing 18 U.S.C. § 1961(5)). Northeast Revenue alleges predicate acts of "bank fraud, mail fraud, and wire fraud." App. 51 ¶ 70. Although bank fraud, mail fraud, and wire fraud may serve as predicate acts to support a RICO claim, see 18 U.S.C. § 1961(1) and Lum, 361 F.3d at 223, the District Court concluded that Northeast

9

Revenue failed to meet the appropriate pleading standard.

Where, as here, the plaintiff relies on bank fraud,[5] mail fraud, and wire fraud[6] as the basis for a RICO violation, it must pled with specificity as required by Federal Rule of Civil Procedure 9(b). See Fed. R. Civ. P. 9(b); Lum, 361 F.3d at 223. Rule 9(b) requires that a plaintiff "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). We have held that "[p]laintiffs may satisfy this requirement by pleading the 'date, place or time' of the fraud, or through 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" Lum, 361 F.3d at 224 (quoting Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984)). A plaintiff "also must allege who made a misrepresentation to whom and the general content of the misrepresentation." Id.

Northeast Revenue alleges that the defendants used "a means and instrumentality of interstate commerce and the mails and phone lines . . . in connection with the sale of securities in Defendant Maps Indeed, Inc. . . . to defraud Plaintiff . . . ." App. 50 ¶ 58. It also alleges that "[t]he course of conduct displayed by Defendants necessarily consisted of instances of bank fraud, mail fraud, and wire fraud . . . in efforts to further the schemes of the enterprise." App. 51 ¶ 70. These allegations lack the specificity required to satisfy

---

[5] The federal bank fraud statute prohibits the knowing execution or attempted execution of a scheme or artifice "(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344.

[6] "The federal mail and wire fraud statutes prohibit the use of the mail or interstate wires for purposes of carrying out any scheme or artifice to defraud." Lum, 361 F.3d at 223 (citing 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud)).

Rule 9(b) because they lack precision and some measure of substantiation. Northeast Revenue attempts to provide substantiation by arguing that its reference to "pro formas" and its inclusion of a "false investment presentation" attached as an exhibit to the Amended Complaint further support its claim. However, there is no indication that the mail or wires were involved in producing or transmitting these documents. Likewise, there is no indication that these documents could support a claim of bank fraud.

Because Northeast Revenue's substantive RICO claim fails as a matter of law, it follows that its conspiracy claim also fails. Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1191 (3d Cir. 1993) ("Any claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient."). Accordingly, the District Court did not err in granting the motion to dismiss the complaint.[7]

## C.

Finally, Northeast Revenue argues that the District Court erred by failing to grant leave to amend the complaint. In Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., we held that "in ordinary civil litigation it is hardly error for a district court to enter final judgment after granting a Rule 12(b)(6) motion to dismiss when the plaintiff has not properly requested leave to amend its complaint." 482 F.3d 247, 253 (3d Cir. 2007). Northeast Revenue did not request leave to amend in the District Court, so the District

---

[7] Northeast Revenue does not challenge the District Court's decision to decline to exercise supplemental jurisdiction over its state law claims. In any event, we note that because the District Court properly dismissed Northeast Revenue's federal claims, the District Court acted within its discretion when it declined to exercise jurisdiction over its state law claims. See 28 U.S.C. § 1367(c)(3).

Court did not abuse its discretion by failing to grant leave sua sponte. Northeast Revenue argues that our holding in Phillips v. County of Allegheny, 515 F.3d 224 (3d Cir. 2008) is contrary to that in Fletcher-Harlee. In Phillips, we stated that "if a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." 515 F.3d at 245. However, Phillips was a civil rights case, and we have consistently held that "in civil rights cases district courts must offer amendment—irrespective of whether it is requested—when dismissing a case for failure to state a claim unless doing so would be inequitable or futile." Fletcher-Harlee, 482 F.3d at 251. Because this is not a civil rights case, the District Court was not required to sua sponte offer amendment.[8]

## IV.

For the reasons set forth above, we will affirm the order of the District Court.

---

[8] Northeast Revenue points to two non-precedential opinions in which we acknowledged "an apparent conflict" between Fletcher-Harlee and Phillips. Northeast Revenue Br. 24 n. 3 (quoting Snyder v. Baxter Healthcare, Inc., 393 F. App'x 905, 910 (3d Cir. 2010)); see also Snyder, 393 F. App'x at 909–10 ("In Phillips, a Section 1983 case, we announced that '[i]f a complaint is vulnerable to 12(b)(6), a district court must permit a curative amendment, unless an amendment would be inequitable or futile.' The reach of this rule outside of the Section 1983 context, and extent to which a district court must sua sponte offer leave to amend remains unresolved." (citation omitted) (quoting Phillips, 515 F.3d at 236)); Guirguis v. Movers Specialty Servs., Inc., 346 F. App'x 774, 777 (3d Cir. 2009) ("The interaction between Phillips and Fletcher-Harlee Corp. presents an interesting question but one that we need not resolve on this appeal."). Although our statement was broad in Phillips, it nonetheless was a civil rights case and the holding of Fletcher-Harlee remains intact, as does our distinction between ordinary civil cases and civil rights case.